UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **DONALD JOE BARBER** | : | **CIVIL ACTION NO. 14-CV-2227** |
| **BOP #29946-001** | | **SECTION P** |
| **VERSES** | : | **JUDGE MINALDI** |
| **CHARLES MAOIRANA, ET AL** | : | **MAGISTRATE KAY** |

**REPORT AND RECOMMENDATION**

Before the court is a civil rights complaint filed *in forma pauperis* by *pro se* plaintiff Donald Joe Barber (hereinafter "Barber" or "plaintiff"), an inmate in the custody of the Federal Bureau of Prisons.[1] He is incarcerated at the Federal Correctional Institute in Oakdale, Louisiana (hereinafter "FCIO"). Barber names the following defendants: FCIO Warden Charles Maoirana; FCIO Administrator Clinton Sonnier; FCIO Physician's Assistant Gaeton Galante (hereinafter "PA Galante"); FCIO Case Manager Kathleen McGee; FCIO Nurses Almondinger and Elizabeth Perkins; FCIO Counselor R. Buxton; FCIO Unit Manager Curry; FCIO Guards Melder and Goodin; FCIO Officer Lieutenant DeVille; FCIO Doctor Alexander; Nurse Adam, Cullman County Detention Center in Cullman, Alabama (hereinafter "CCDC"); CCDC Warden Potter; CCDC Deputy Campbell; Savoy Cancer Center Doctor John Rainey; and "defendants 1-30 not yet known but to be added when ascertained." Doc. 28, p. 1.

This matter has been referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. § 636 and the standing orders of this court.

---

[1] This matter arises under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) which authorizes civil rights suits filed against federal agents or employees for violations of constitutional rights.

# I.
## BACKGROUND

Barber arrived at FCIO in October 2013. Doc. 28, p. 3. Prior to that time, he had been diagnosed with prostate cancer and an enlarged heart. *Id.* With respect to those health problems (and a plethora of others discussed herein), plaintiff claims that the defendants have been deliberately indifferent to his medical needs. In support of his assertion, he details a very extensive medical history, beginning with his passing out upon arrival at FCIO. *Id.* Barber states that he was sent to the medical department where he was given a blood test, an EKG, and a prescription for Meloxicam, an arthritis medication. *Id.* He further asserts that in November 2013, the Bureau of Prisons' regional office gave approval for him to see a cardiologist, urologist, and oncologist. Doc. 28, p. 11.

Pursuant to a writ, Barber was transported from FCIO on December 10, 2013, and brought to CCDC. Doc. 28, pp. 3, 13. While there he fell in water on a catwalk caused by a leaking shower and injured his knees. Doc. 28, p. 13. Barber states that he was denied proper medical care and that defendants Potter, Adam, and Campbell knew about the shower leak prior to his fall but failed to repair it. *Id.* Upon his February 12, 2014, return to FCIO plaintiff reported to sick call concerning his injuries and defendant Galante, a physician's assistant at FCIO ordered x-rays which revealed arthritis and bone fragments in Barber's knees. *Id.* Galante allegedly told him that there was nothing that could be done and plaintiff's requests to see an orthopedic surgeon were apparently denied. *Id.* Barber further asserts that, after returning to FCIO, he was housed in front of a large fan which he claims aggravated his arthritis. Doc. 28, p. 14. He asked defendants Buxton and McGee to move him but those requests were also denied. *Id.*

On March 19, 2014, Barber saw Galante for knee pain and was again prescribed Meloxicam. Doc. 28, p. 3. He was taken to a private clinic on March 26, 2014, where he saw Dr. Jones who told him that his EKG "looked terrible and that his PSA was through the roof." *Id.* Jones placed Barber on aspirin,

prescribed nitro-glycerin, ordered blood pressure checks twice weekly, blood tests once a week for 180 days, and that he see a cardiologist. *Id.*

On April 4, 2014, due to his diagnosis with prostate cancer, Barber was taken to a urologist. *Id.* Alarmed at the plaintiff's PSA number, the doctor ordered a bone scan and other tests. *Id.* Barber states that the doctor indicated that he wanted to see him back in the office on May 1, 2014. Doc. 28, p. 4. Thereafter, on April 10, 2014, Barber was sent to an oncologist, who also indicated that he wanted to see Barber on May 1, 2014. *Id.* On April 14, 2014, defendant Autin dispensed the nitro-glycerin Dr. Jones had prescribed, and the blood tests were carried out as ordered. *Id.*

On April 21, 2014, Barber experienced chest pains and was sent to Oakdale Community Hospital via ambulance. *Id.* Tests revealed that he had degenerative kidney disease caused by the Meloxicam. *Id.* He was released from the hospital on April 24, 2014, with instructions on kidney care. Said instructions were allegedly given to Galante who entered the information into the computer and then, according to plaintiff, destroyed the papers. *Id.*

On April 28, 2014, Barber reported to sick call again and was given Tylenol for shoulder, hip, back, and knee pain. *Id.* On May 14, 2014, a blood test taken at FCIO revealed the earlier diagnosed kidney disease but Barber states that he was not told the results of the test and that he was instructed to keep taking Tylenol. *Id.* On that same day, he was taken to Savoy Imaging Center for bone and CT scans. *Id.* The bone scan revealed a left iliac artery aneurysm. *Id.* Plaintiff avers that the imaging center doctor contacted Galante about the aneurysm and told him that it needed urgent attention. *Id.*

Around this time, Barber apparently requested a grievance form from defendant Buxton in order to file a complaint about his placement in front of the fan and its alleged exacerbation of his arthritis. Doc. 28, p. 5. Thereafter, Buxton apparently did move Barber to another unit but housed him, this time, in front of an air conditioner. *Id.* Barber generally claims that this measure was taken in retaliation for him

exercising his constitutional rights. Doc. 28, p. 14. He filed an SF-95 grievance against FCIO's clinic staff on May 15, 2014. Doc. 28, p. 4. On May 20, 2014, plaintiff alleges that defendant Buxton asked him what it would take to get him to drop the SF-95 grievance. Barber avers that he responded by requesting that he be moved away from the air conditioner. *Id*. Thereafter he was moved to a different bunk. *Id.*

On May 16, 2014, Barber had chest pains and was sent to medical for an EKG. *Id.* He was then brought to Oakdale Community Hospital, where it was determined that he had had a mild heart attack. *Id.* There following day he was transferred to Christis St. Francis Cabrini Hospital in Alexandria, Louisiana, where a heart catheter was put in place. Doc. 28, p. 5. Upon returning to FCIO, plaintiff claims that his discharge papers were again destroyed, but states that Galante issued him a "short line pass" on May 19, 2014. *Id.*

On May 21, 2014, Barber again had chest pains and saw defendant Perkins at medical. *Id.* Perkins, however, informed plaintiff that he would have to wait until after pill line in order to be seen. *Id.* Within minutes Barber passed out. *Id.* Perkins closed the pill line, did an EKG, and sent Barber back to his unit in a wheel chair. *Id.* Barber went to the pill line the following day in the wheel chair and at some point Buxton told him that he would have to be moved again. *Id.* He was moved back in front of the air conditioner and, accordingly, refiled his grievance. *Id.*

On June 3, 2014, Barber was taken to a vascular surgeon concerning the aneurysm in his hip and signed surgery consent forms that same day. *Id.* On June 5, 2014, defendant Curry asked Barber what could be done to get him to drop the grievance he had filed and Barber again requested that he be moved away from the air conditioner. *Id.* Thereafter defendant Buxton approached Barber and told him that he was moving to a different cell. *Id.* Barber claims that, while he was packing, Buxton told "the mexicans

[sic] that Plaintiff was moving in with that the choice was not his but that Plaintiff would not be there long as they (the mexicans [sic]) would give Plaintiff such a hard time he would ask to be moved." *Id.*

Barber reported to sick call once again on June 9, 2014, with complaints of back pain. *Id.* While waiting for his appointment, he was called in to defendant Almondinger's office and was questioned by Almondinger and defendant Sonnier about his SF-95 and BP-9 grievances. Doc. 28, p. 6. Barber refused to drop either claim and was instructed to return to medical. *Id.* Upon doing so, Galante informed him that that he would have to come back the next day. Despite that assurance, however, Barber claims that Galante was not at work the following day and that he was forced to wait eight days to see him as a result. *Id.*

On June 17, 2014, Barber received approval from the utilization review board to see a nephrologist and radiologist. *Id.* Subsequently, on June 26, 2014, he received notice that he was on a list to be seen by dental regarding a filling that had been missing since his arrival at FCIO. Doc. 28, pp. 3, 6. On July 2, 2014, Barber was experiencing back and knee pain, so he reported to sick call and scheduled an appointment with Galante for July 7, 2014. *Id.* He returned to the clinic on July 3, 2014, to request a soft shoe pass for visitation. *Id.* While there, he was called into defendant Sonnier's office and was asked to withdraw another BP-9 greivence, was further informed that the dental list was "fluid" and that his name could go up or go down, and was allegedly told that it would be another year before his tooth would be repaired. *Id.* Barber went to his appointment with Galante on July 7, 2014, in regard to his back and knee problems and was told to "get use to it, it is going to be with you for a long time." *Id.* His request to see a "real doctor" was denied. Doc. 28, p. 7.

On July 11, 2014, Barber was taken to Cabrini Hospital for a CT scan and other testing. *Id.* He was also scheduled to have another test done that same day at Savoy Imaging Center but missed that appointment because the tests at Cabrini ran late. *Id.* Barber states that he saw defendant Maoirana on

July 12, 2014, and July 14, 2014, and asked him about expediting his surgeries.  Doc. 28, pp. 6, 7.  On July 23, 2014, defendants Buxton and Curry inquired about the basis for Barber's SF-95 grievance, and the plaintiff explained that it primarily concerned the four months he had spent sleeping in front of the air conditioner.   Doc. 28, p. 7.

Barber was taken to Savoy Imaging on July 30, 2014, for a third CT scan.  *Id.*  While there, he met with Dr. Rice to schedule stent surgery for the aforementioned aneurysm.  *Id.*  On August 1, 2014, he again went to sick call about knee, back, and hip pain.  *Id.*  An appointment was scheduled with PA Galante for August 5, 2014, wherein Tylenol III was prescribed.  *Id.*  On the same day, Barber was placed in the special housing unit (hereinafter "SHU") in preparation for surgery at Cabrini Hospital the next day.  *Id.*  While there, he asked defendant Perkins for medication but Perkins apparently did not comply.  *Id.*

During the surgery at Cabrini Hospital on August 6, 2014, a stent was placed in his left iliac artery.  Doc. 28, p. 8.  Upon being discharged, he was advised to go to the emergency room if he had any unusual pains.  *Id.*  Once released, defendants Melder and Goodin transported him back to FCIO.  *Id.*  Barber claims that Melder's reckless driving caused him to hit his head on the van's ceiling as he was not in a seatbelt.  *Id.*  As a result, he claims that he injured his back and that he has since been confined to a wheelchair.  *Id.*

On August 9, 2014, Barber woke up at three in the morning with testicle pain.  Defendant DeVille was notified and went to Barber's cell.  *Id.*  DeVille told him to go to the nurse in the morning.  *Id.*  The next morning, Barber was seen by the nurse following pill line.  *Id.*  He was given Tylenol III and had to push himself back to his unit.  *Id.*  The following day, he was brought to the SHU in preparation for a doctor's appointment.  *Id.*  He was taken to the appointment on August 11, 2014, but learned that it had been cancelled.  *Id.*  Once back at FCIO, Barber went to medical to get medication to relieve pain in his back and knees.  *Id.*  Defendant Sonnier sent him to PA Galante.  *Id.*

On August 27, 2014, Barber was sent to see Dr. Rainey, an oncologist. Doc. 28, p. 9. Rainey inquired about some testing that he had ordered, gave Barber a prescription for pain medication, and told him to return in three months. *Id.* Barber went to sick call on September 5, 2014, and scheduled an appointment with PA Galante for September 10, 2014. *Id.* At that appointment, Galante stated that he did not know anything about the prescription written by Dr. Rainy. *Id.*

Barber was brought to Savoy Imaging Center for another CT scan on September 30, 2014. *Id.* During that appointment, Dr. Rice told Barber that another stent was needed because the one that had recently been installed was leaking. *Id.* During an appointment with PA Galante on October 22, 2014, Barber was told that another surgery would soon follow. *Id.*

On October 31, 2014, Barber complained about his unit being cold and on November 5, 2014, he asked defendant Buxton to turn on the heater. *Id.* Barber was called to medical on November 9, 2014, wherein defendant Buxton had him sign a release so his medical records could be sent to Jennifer Evans in Washington. *Id.* On November 13, 2014, Barber was brought to Savoy Cancer Center to see Dr. Rainey. Doc. 28, p. 23. Barber was experiencing chest pains and was sent to the ER. *Id.* Tests were conducted and he was instructed to see a cardiologist. *Id.*

## II.
### ALLEGED CONSTITUTIONAL VIOLATIONS

As detailed above, Barber claims that defendants Sonnier, Galante, Maoirana, Perkins, Almondinger, and Alexandre have delayed, denied, and/or refused needed medical care and thus have violated his constitutional rights against cruel and unusual punishment under the Eighth Amendment. Doc. 28, pp. 5, 7, 10-14, 23. He also claims that defendants Sonnier, Galante, Maoirana, and Almondinger violated his constitutional rights by destroying papers necessary for his medical treatment. Doc. 28, p. 12. Barber further contends that he has received only minimal medical services in retaliation for filing the SF-95 claim against defendants Sonnier and Maoirana. *Id.* He also claims that Sonnier and Maoirana are

responsible for understaffing FCIO's medical department, doc. 28, p. 15, and that Sonnier and Galante have violated the Americans with Disabilities Act (hereinafter "ADA") by refusing to give him an extra mattress after he had trouble sleeping due to arthritis. Doc. 28, p. 22.

Additionally, Barber contends that CCDC Warden Potter, Deputy Campbell, and Nurse Adam violated his constitutional rights by failing to correct the known water leak which caused him to fall. Doc. 28, p. 13. He further claims that Potter, Campbell, and Adam refused to provide proper medical care for the injuries sustained in his fall as well as for his missing dental filling. Doc. 28, pp. 13, 15.

As to defendants Buxton and McGee, Barber claims that they violated his constitutional rights by placing him near a fan/air conditioner and/or refusing to move him away from same after numerous requests. Doc. 28, p. 14. He further claims that Buxton violated his constitutional rights by "inciting the Mexicans to rally against" him and by telling another inmate that he was a sex offender, which he claims is false. Doc. 28, p. 17.

With respect to Dr. Rainey, Barber claims that he was deliberately indifferent to his medical needs in failing to provide the proper testing to treat his cancer. Doc. 28, p. 19. Likewise, Barber contends that defendant Curry was also deliberately indifferent to his medical needs when he violated the ADA by placing him in front of an air conditioner and thus allegedly aggravating his arthritis. Doc. 28, pp. 20, 22. He also claims that Curry threatened him with fines and additional prison time if he did not withdraw his SF-95 greivance. Doc. 28, p. 22. Barber further asserts that both Curry and Maoirana retaliated against him for filing said greivance by refusing to grant a furlough for him to see his dying son. Doc. 28, p. 22.

Finally Barber claims that defendants Melder and Goodin were deliberately indifferent to his medical needs by failing to place him in a seatbelt when transporting him from the hospital to FCIO, and by operating the vehicle in a manner so reckless as to cause him to injure his head on the vehicle's ceiling. Doc. 28, p. 18.

## III.
### REQUESTED RELIEF

Barber now seeks "ten million…dollars in compensatory damages and two million dollars…in actual damages for pain and suffering" as well as punitive damages for the alleged violations noted above. Doc. 28, p. 25.  He also seeks an order from this court compelling the defendants to: (1) expediently address all of his medical needs, including various treatments and surgeries and (2) properly staff FCIO's medical department. *Id.*

## IV.
### LAW AND ANALYSIS

### *A. Frivolity Review*

Barber has been granted leave to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915. Doc. 12.  Under 28 U.S.C. § 1915(e)(2)(B)(i) and (ii), district courts are directed to dismiss actions they determine to be frivolous, malicious, or that fail to state a claim on which relief may be granted.  See 28 U.S.C. § 1915(e)(2)(B)(i) and (ii); *Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998).  A complaint is frivolous if it lacks an arguable basis in law or fact. *Gonzalez v. Wyatt,* 157 F.3d 1016, 1019 (5th Cir. 1998) (citing *Siglar v. Hightower,* 112 F.3d 191, 193 (5th Cir. 1997)). A complaint fails to state a claim upon which relief may be granted if it is clear the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief. *Doe v. Dallas Indep. Sch. Dist.,* 153 F.3d 211, 215 (5th Cir. 1998).  In determining whether a complaint is frivolous or fails to state a claim upon which relief may be granted, the court must accept the plaintiff's allegations as true. *Horton v. Cockrell,* 70 F.3d 397, 400 (5th Cir. 1995) (frivolity); *Bradley,* 157 F.3d at 1025 (failure to state a claim).

### *B. 42 U.S.C. § 1983*

Section 1983 proscribes conduct by any person who, under the color of state law, acts to deprive another person of any right, privilege, or immunity secured by the Constitution and laws of the United States.  42 U.S.C. § 1983. Thus, an initial inquiry in a lawsuit filed under § 1983 is whether a plaintiff has

alleged that his constitutional rights have been violated. If no constitutional violation has been alleged, there is no cognizable claim under § 1983. In order to hold the defendants liable under 42 U.S.C. § 1983, the plaintiff must allege facts to show (1) that a constitutional right has been violated and (2) that the conduct complained of was committed by a person acting under color of state law, that is, that the defendant was a state actor. *Hessbrook v. Lennon,* 777 F.2d. 999, 1005 (5th Cir. 1985).

In the context of prisons and prison officials, a constitutional violation occurs only when two requirements are met. First, the prison official's act or omission must result in a deprivation that is sufficiently serious, such that it results in the denial of "the minimal civilized measure of life's necessities" or denies the prisoner some basic human need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson v. Setter*, 501 U.S. 294, 304 (1991). Second, the court must determine that the prison official responsible for the deprivation has been "'deliberately indifferent' to inmate health or safety." *Farmer,* 511 U.S. at 834. A finding of deliberate indifference requires a finding that a prison official was personally aware of facts from which an inference could be drawn that a substantial risk of serious harm existed in undertaking the act or omission complained of, and that he or she actually drew that inference. *Id.* at 837.

### C. Medical Care

Barber's allegations, here, simply do not rise to the level of cruel and unusual punishment under the Eight Amendment, even to the extent that he is attempting to allege that his medical care was inadequate. In order to prevail on such claims, convicted prisoners must establish that the refusal or delay in providing medical care was "sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

Deliberate indifference in the context of the failure to provide reasonable medical care means that: (1) the prison officials were aware of facts from which an inference of substantial risk of serious harm could be drawn; (2) the officials actually drew that inference; and (3) the officials' response indicated that

they subjectively intended that harm occur. *Thompson v. Upshur County, Texas,* 245 F.3d 447, 458–59 (5th Cir. 2001). "[T]he failure to alleviate a significant risk that [the official] should have perceived, but did not, in fact perceive, is insufficient to show deliberate indifference." *Domino v. Texas Department of Criminal Justice,* 239 F.3d 752, 756 (5th Cir. 2001).

Moreover, "deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson,* 245 F.3d at 459. "Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind." *McCormick v. Stalder,* 105 F.3d 1059, 1061 (5th Cir. 1997). "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner," and so the prisoner must "allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle,* 429 U.S. at 103 & 106; *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 650 (5th Cir. 1996). The official must have a subjective intent to cause harm. *Mace v. City of Palestine*, 333 F.3d 621, 625 (5th Cir. 2003). In other words, deliberate indifference (i.e., a subjective intent to cause harm), cannot be inferred merely from a prison official's failure to act reasonably. *Hare,* 74 F.3d at 649.

Furthermore, a plaintiff's mere disagreement with what medical care is appropriate or with the course of treatment offered by the medical staff will not, alone, suffice to state a claim of deliberate indifference to serious medical needs. *Norton v. Dimazana,* 122 F.3d 286, 292 (5th Cir.1997). In *Woodall v. Foti,* 648 F.2d. 268, 272 (5th Cir.1981), the Fifth Circuit stated that the applicable standard requires a balancing of the needs of the prisoner with the needs of the penal institution, and the test is one dependent on medical necessity rather than desirability.

Additionally, the fact that a plaintiff does not believe his medical treatment was as good as it should have been is not a cognizable complaint under the Civil Rights Act. Prisoners are not constitutionally entitled to the best medical care that money can buy. *Id*. Merely alleging that a prison doctor should have

undertaken additional diagnostic measures or should have utilized an alternative method of treatment does not elevate a claim to constitutional dimensions. *Varnado v. Lynaugh,* 920 F.2d 320, 321 (5th Cir. 1992). Similarly, the fact that a plaintiff continues to suffer from pain is insufficient, in and of itself, to establish that a constitutional violation has occurred. *Mayweather v. Foti,* 958 F.2d 91 (5th Cir. 1992).

Here, Barber's complaint and the amendments thereto show that plaintiff received a substantial amount of medical treatment, including appointments with multiple doctors, testing, scans, sick call appointments, medication, hospital treatment, surgery, etc. Barber's allegations, at most, state a disagreement between him and the medical staff regarding the procedures necessary to treat his medical issues.

As previously stated, such claims are insufficient to establish that a constitutional violation has occurred. Absent a constitutional violation, federal courts are generally reluctant to interfere in the internal affairs of a prison. See *Shaw v. Murphy*, 532 U.S. 223 (2001). Decisions with respect to the medical treatment of prisoners are best left to the prison officials qualified to make those decisions.

Accordingly, we find that Barber has not alleged facts sufficient to establish deliberate indifference and his claims in this regard should be dismissed.

### *D. Retaliation*

Barber states that he was retaliated against for pursuing legal actions against several of the defendants. Prison officials may not retaliate against an inmate because that inmate exercised a right guaranteed to him under the Constitution. *Woods v. Smith*, 60 F.3d 1161, 1164 (5th Cir. 1995). However, as the Fifth Circuit has emphasized, claims of retaliation from prison inmates must "be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in penal institutions. *Id.* at 1166.

To state a claim of retaliation, a prisoner must allege facts which establish that (1) he exercised a specific constitutional right, (2) the defendant had the intent to retaliate against him for his exercise of that right, (3) a retaliatory adverse act occurred, and (4) causation. Causation requires a showing that "but for the retaliatory motive the complained of incident ... would not have occurred." *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997) (quoting *Woods v. Smith*, 60 F.3d at 1166)), *cert. denied*, 522 U.S. 995, 118 S.Ct. 559, 139 L.Ed.2d 400 (1997). "The inmate must allege more than his personal belief that he is the victim of retaliation." *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999). "The inmate must produce direct evidence of motivation or, the more probable scenario, allege a chronology of events from which retaliation may plausibly be inferred." *Id.* (quoting *Woods v. Smith,* 60 F.3d at 1166.

Barber's allegations in support of his claims are conclusory at best and are therefore insufficient. Conclusory allegations of retaliatory motive or intent are not sufficient to evidence a pattern of retaliation or a retaliatory motive. Accordingly, they should be dismissed.

### E. *Improper Defendant—Dr. Rainey as a Private Physician*

As noted above, this matter is properly brought pursuant to *Bivens*. In order to state a *Bivens* claim, a plaintiff must allege that an individual acting under federal law deprived him of a right secured by the United States Constitution. In this action, there is nothing to indicate that Dr. Rainey is, in any manner, a federal actor. Barber does not allege that that Rainey, an oncologist, is anything other than a private physician that treated him at the Savoy Cancer Center in Mamou, Louisiana. Even assuming that Dr. Rainey could be considered a federal actor, Barber has nonetheless failed to come forward with facts demonstrating a violation of his constitutional right to adequate medical treatment for reasons discussed above.

### F. *Defendants Adam, Potter, and Campbell*

Barber complains of conditions of confinement at CCDC in Alabama, and also that he was denied adequate medical care while there. He names CCDC Nurse Adam, CCDC Warden Potter, and CCDC

Deputy Campbell as his defendant in regard to his claims arising at that facility. These claims would best be reviewed by the proper court in the State of Alabama. None of the defendants reside in Louisiana and CCDC is not located in Louisiana. Any witnesses to the alleged incidents described are not in Louisiana nor are the files or medical records related to them.

Title 28 U.S.C. §§ 1406(a) and 1404(a) allow for the transfer of a case from one district to another district or division in which venue is proper, for the convenience of parties and witnesses and in the interest of justice. See *Balawajder v. Scott*, 160 F.3d 1066, 1067 (5th Cir. 1999). This court is dismissing Barber's claims against all of the defendants located in the Western District of Louisiana, and all matters relative to the events that occurred in the Western District of Louisiana. As such, the only remaining claims will be against defendants Adam, Potter, and Campbell. Thus, it is in the interest of justice and fairness to the parties that this civil action be transferred to the United States District Court for the Northern District of Alabama for further consideration.

### G. *Defendants Melder and Goodin*

As noted above, Barber claims that defendants Melder and Goodin were deliberately indifferent to his medical needs by failing to place him in a seatbelt when transporting him from the hospital to FCIO, and by operating the vehicle in a manner so reckless as to cause him to injure his head on the vehicle's ceiling. As previously discussed, "[T]he failure to alleviate a significant risk that [the official] should have perceived, but did not, in fact, perceive is insufficient to show deliberate indifference." *Domino,* 239 F.3d at 756. Moreover, "deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson*, 245 F.3d at 459.

In the present case, Barber clearly alleges that it was the negligent acts of the Melder and Goodin that resulted in the accident that caused his alleged injury. As such, these allegations fail to state a claim upon which relief can be granted and should be dismissed.

### H. *Conditions of Confinement—Placement in Front of Fan/Air Conditioner*

Barber contends that defendants Curry, Buxton and McGee violated his constitutional rights by placing him near a fan/air conditioner and/or refusing to move him away from it after he requested that he be so moved. As a result, he claims that his arthritis was exacerbated. In such cases, a plaintiff must establish that the conditions of confinement were sufficiently harmful to evidence deliberate indifference to his needs. "The Constitution 'does not mandate comfortable prisons,' ... but neither does it permit inhumane ones...." *Farmer*, 511 U.S. at 832, (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981)). Prison officials must provide humane conditions of confinement, including adequate shelter. *Farmer*, 511 U.S. at 832.

To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society. *Rhodes*, 452 U.S. at 347. However, when the restrictions of confinement rise to a level that results in physical torture, it can result in pain without penological purpose constituting cruel and unusual punishment under the Eighth Amendment. *Id*. *Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998).

Barber has not shown that the defendants acted with deliberate indifference. At most, his claims show that he was uncomfortable for a period of time but not that he was deprived of a basic human need. His claims in this regard do not rise to the level of a constitutional violation and they should therefore be dismissed.

### I. *Barber's ADA Claim*

Barber alleges that Sonnier and Galante have violated the ADA by refusing to give him an extra mattress after his arthritis caused him to have trouble sleeping. However, the ADA does not apply to the federal government, its agencies or employees. *Luna v. Roche*, 89 Fed. Appx. 878, 881 n. 4 (5th Cir. 2004).

Moreover, Barber has not shown that he is disabled or that his claim would be one that is even covered under the ADA. To establish a *prima facie* case for discrimination under the ADA, a plaintiff must be a qualified individual with a disability. *Mason v. United Air Lines*, 274 F.3d 314, 316 (5th Cir. 2001)(unpublished opinion). "Under the ADA, 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.' 42 U.S.C. § 12132. A plaintiff must show '(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability.' *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011). To have a qualifying disability, a plaintiff must demonstrate "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *Id.* at 499–500 (internal quotations omitted). *Nottingham v. Richardson*, 499 F. App'x 368, 376 (5th Cir. 2012)(unpublished opinion).

Thus, notwithstanding the facts that (1) the ADA does not apply to federal institutions or employees, and (2) Barber has not shown that he is a qualified individual with a disability under the ADA, his allegations also fail to state an ADA claim because he has presented no evidence of discrimination on account of such a disability. Here, Barber alleges a deprivation resulting merely from Sonnier and Galante's failure to make special accommodations for his arthritis (i.e. failure to provide an extra mattress). These are allegations of discrimination. His claims with respect to the ADA should therefore be dismissed.

*J. Sex Offender Labeling*

Barber claims that Buxton violated his constitutional rights by telling another inmate that he was a sex offender, which he states is false.  However, even if Buxton did make this statement, Barber cannot make out a constitutional claim against him as there is no allegation or evidence to indicate that Buxton's statements caused Barber any injury. Other than fear of reprisal from other inmates, Barber alleged no injury, damage, or prejudice resulting from this action.  Barber has failed to state a constitutional violation with respect to this claim.  See *Geiger, v. Jowers*, 404 F.3d 371, 375 (5th Cir. 2005); *Moore v. Lightfoot*, 286 F. App'x 844, 849-50 (5th Cir. 2008).

### III.
#### CONCLUSION

For reasons stated above,

**IT IS RECOMMENDED** that Barber's civil rights complaint against defendants Maoirana, Sonnier, Galante, McGee, Almondinger, Perkins, Buxton, Curry, Melder, Goodin, DeVille, Alexander, Rainey, and unknown defendants be **DENIED AND DISMISSED WITH PREJUDICE** as frivolous and for failing to state a claim upon which relief can be granted in accordance with 28 U.S.C. § 1915(e)(2)(B)(i), (ii), and (iii).

**IT IS FURTHER RECOMMENDED** that Barber's civil rights action against Cullman County Detention Center defendants Nurse Adam, Warden Potter, and Deputy Campbell be transferred to the United States District Court for the Northern District of Alabama for further consideration.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the clerk of court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

**Failure to file written objections to the proposed factual finding and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. See** *Douglas v. United Services Automobile Association,* **79 F.3d 1415 (5th Cir. 1996).**

THUS DONE this 3rd day of June, 2015.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE